412 Mass. 845 (1992)
593 N.E.2d 1297
KATHY A. REEP
vs.
COMMISSIONER OF THE DEPARTMENT OF EMPLOYMENT AND TRAINING.
Supreme Judicial Court of Massachusetts, Hampshire.
February 4, 1992.
June 11, 1992.
Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.
Michael C. Cullen, Assistant Attorney General, for the defendant.
Edward R. Mitnick (Beth D. Cohen with him) for the plaintiff.
Allan Rodgers, Jamie Ann Sabino, Sarah Wunsch & Mary L. Bonauto, for Civil Liberties Union of Massachusetts & others, amici curiae, submitted a brief.
GREANEY, J.
The plaintiff, Kathy A. Reep, was employed as a teacher of deaf and hard of hearing students in Norwell. *846 In June, 1989, she declined an offer of reappointment for the forthcoming school year because her partner of thirteen years, Robert Kurnit, was relocating his business from Cambridge to Northampton, and she intended to move to Northampton with him. In August, 1989, unable to secure a teaching position in Northampton, she applied for unemployment benefits there. A review examiner with the Department of Employment and Training (department) denied her claim, ruling that, because she was not married to her partner, as matter of law her decision to leave her employment to remain with him did not constitute an "urgent, compelling and necessitous" reason under G.L.c. 151A, § 25 (e) (1990 ed.). The department's board of review affirmed without a hearing the examiner's determination. The plaintiff sought judicial review of the agency decision, and a judge of the District Court reversed that decision and awarded the plaintiff unemployment benefits. The department then appealed from the decision of the District Court judge. We transferred the case to this court on our own motion, and we affirm the District Court judgment.[1]
Under the Commonwealth's employment and training law, an individual who is otherwise eligible for unemployment compensation shall be disqualified if the individual leaves work "voluntarily without good cause attributable to the employing unit." G.L.c. 151A, § 25 (e) (1) (1990 ed.). Section 25 (e) also provides, however, that a person shall not be disqualified if he or she "establishes to the satisfaction of the *847 commissioner that [his or her] reasons for leaving were for such an urgent, compelling and necessitous nature as to make [his or her] separation involuntary."
The statute was enacted to afford relief to those who are separated from their employment through no fault of their own. See Haefs v. Director of the Div. of Employment Sec., 391 Mass. 804, 806 (1984); Raytheon Co. v. Director of the Div. of Employment Sec., 364 Mass. 593, 596 (1974); Howard Bros. Mfg. Co. v. Director of the Div. of Employment Sec., 333 Mass. 244, 248 (1955). In addition, the statute expressly provides that the law should be liberally construed to establish its purpose, which is "to lighten the burden which now falls on the unemployed worker and his family." See G.L. 151A, § 74 (1990 ed.); Morillo v. Director of the Div. of Employment Sec., 394 Mass. 765, 766 (1985); Haefs v. Director of the Div. of Employment Sec., supra; Roush v. Director of the Div. of Employment Sec., 377 Mass. 572, 574 (1979); General Elec. Co. v. Director of the Div. of Employment Sec., 349 Mass. 207, 210-211 (1965). Consequently, "[w]hen faced with statutory opaqueness in the unemployment compensation law," we have construed the statute in favor of the unemployed worker. Emerson v. Director of the Div. of Employment Sec., 393 Mass. 351, 352 (1984). See Roush v. Director of the Div. of Employment Sec., supra at 575; General Elec. Co. v. Director of the Div. of Employment Sec., supra. Consistent with this interpretation, we have recognized that the broad purpose of § 25 (e) is to "provide temporary relief for those who are realistically compelled to leave work through no `fault' of their own, whatever the source of the compulsion, personal or employer-initiated." Raytheon Co. v. Director of the Div. of Employment Sec., 364 Mass. at 596. Moreover, unlike other jurisdictions, Massachusetts does not require that the compelling personal reasons be work-related. See Raytheon Co. v. Director of the Div. of Employment Sec., 344 Mass. 369, 372-373 (1962).
Applying the broad provisions of § 25 (e), we have recognized a wide variety of personal circumstances that constitute *848 good cause to decline otherwise suitable employment. See, e.g., Manias v. Director of the Div. of Employment Sec., 388 Mass. 201, 204 (1983) (family obligations); Director of the Div. of Employment Sec. v. Fitzgerald, 382 Mass. 159, 161-162 & n. 6 (1980) (pregnancy or pregnancy-related disability); Director of the Div. of Employment Sec. v. Fingerman, 378 Mass. 461, 464 (1979) (leaving work to pack, move, and seek a new permanent home in another State where spouse had secured employment); Raytheon Co. v. Director of the Div. of Employment Sec., 364 Mass. at 597-598 (lack of transportation to work site). These decisions have been reached under the broad standard stated in Raytheon Co. v. Director of the Div. of Employment Sec., 344 Mass. at 373-374, quoting Sturdevant Unemployment Compensation Case, 158 Pa. Super. 548, 557-558 (1946), in the following terms:
"[I]f a worker leaves ... employment when ... compelled to do so by necessitous circumstances or because of legal or family obligations, his [or her] leaving work is voluntary with good cause, and under the act he [or she] is entitled to benefits. The pressure of necessity, of legal duty, or family obligations, or other overpowering circumstances and his [or her] capitulation to them transform what is ostensibly voluntary unemployment into involuntary unemployment.... The nature of the circumstances in each individual case, the strength and the effect of the compulsive pressure of external and objective forces must be evaluated, and if they are sufficiently potent, they become relevant and controlling factors."[2]
*849 A proper resolution of the plaintiff's claim, therefore, requires cognizance of the following principles: (1) neither § 25 (e), nor any other provision of G.L.c. 151A, nor any regulation promulgated by the department makes any distinction based on the marital status of the claimant for purposes of entitlement to unemployment compensation; (2) we have never held that, where a claimant leaves employment to join a partner in a new locality, unemployment compensation is solely restricted to married spouses; rather, the applicable standard is the one set forth in Raytheon Co. v. Director of the Div. of Employment Sec., 344 Mass. at 373-374; and (3) that standard is to be applied with an eye toward the liberal construction of the statute required by its own provisions and by our cases.
It is clear that the review examiner in this case decided the claim on the erroneous basis that the plaintiff could not recover unless she were married or engaged to be married. The following examination of the plaintiff by the review examiner establishes this misapprehension:
REVIEW EXAMINER: "Okay. Are there any  do you have any plans to become legally married in the near future?"
THE PLAINTIFF: "I'm not sure what bearing that has on this, but "
REVIEW EXAMINER: "I understand  the question is "
THE PLAINTIFF: "It seems a little intrusive although "
REVIEW EXAMINER: "Let me explain. When people move from one area to another, if one spouse is moving to move with another spouse, people who are legally married, in cases like that, people can be approved to collect unemployment benefits."
THE PLAINTIFF: "Yes, I understand."
REVIEW EXAMINER: "And people who are engaged, who would be marrying in the very near future could also possibly be approved. That's why I'm asking that question."
*850 THE PLAINTIFF: "It's something that we're discussing. But there has not been a date set."
REVIEW EXAMINER: "Okay. All right. Thank-you very much. I don't have any other questions...."
This examination was translated into the following findings of fact by the review examiner: "The claimant has been living with her partner for 13 years. They are not married. They have no immediate plans to marry." That finding led inexorably to an ultimate finding and conclusion of law as follows: "From the foregoing facts and testimony, it is found that the claimant left her job to move, with her partner of 13 years, to an area beyond commuting distance from her place of employment; that the claimant and her partner are not married; that they have no plans to marry in the near future; that this cannot under the circumstances, be considered a compelling reason; that the claimant's leaving, therefore, was voluntary without good cause attributable to the employing unit; and finally, that the claimant is subject to disqualification under Section 25 (e) (1) of the law."
On appeal, the department urges us to rule that, while a married spouse who leaves employment in order to relocate with his or her partner has presented a sufficiently compelling reason to qualify for benefits, an unmarried partner is not entitled to an opportunity to demonstrate that his or her reasons for leaving are similarly necessitous. In support of its argument, the department cites cases in which this court has rejected common law marriage, has denied alimony and loss of spousal consortium benefits to unmarried but cohabiting persons, and has limited the evidentiary rule of spousal privilege to conversations that occur during marriage. In our view, however, these decisions are not relevant. They concern actions directly based on the existence of marriage and its attendant legal rights and obligations. In such cases, a legally cognizable relationship is a threshold requirement. Feliciano v. Rosemar Silver Co., 401 Mass. 141, 142 (1987). This action, by contrast, concerns a statutory benefit for which, we have held in another context, a legally cognizable *851 relationship is not a prerequisite. Roush v. Director of the Div. of Employment Sec., supra at 575.
We may infer from the broad and indefinite language of § 25 (e) that the Legislature sought to provide "standards flexible enough to insure effective application of legislative policy to changing circumstances," 1A C. Sands, Sutherland Statutory Construction § 21.16, at 135 (4th ed. 1985), and that in applying these standards, "mathematical precision [is] neither possible nor desirable." Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975). Therefore, while we may reasonably create a presumption that a married person who leaves work to join his or her spouse has met the standard required by § 25 (e), see Raytheon Co. v. Director of the Div. of Employment Sec., 346 Mass. 733, 736 (1964), we believe that it would be improper to create a rule that denies a nonmarital partner the right to prove, without benefit of that presumption, that his or her reasons for leaving employment are also "urgent, compelling and necessitous." Workable standards for making these determinations can be fashioned,[3] and review examiners, who already must decide what constitutes "good cause" under § 25 (a) of the statute, a "stoppage of work" under § 25 (b), and "suitable employment" within the meaning of § 25 (c), are capable of applying these standards to individual cases. The possibility of additional administrative burden, in any event, cannot justify judicial amendment of § 25 (e) to create a rule denying benefits to persons who can prove they acted reasonably, based on pressing circumstances, in leaving employment.
The record of this case makes clear that the plaintiff presented testimony to warrant the review examiner in finding *852 in her favor, or, at the least, to require the examiner to hear additional evidence[4] before concluding that her reasons for leaving employment were not "urgent, compelling and necessitous." She stated that she has lived continuously with her partner since 1976. The couple has lived in a number of States and in two countries during that time, moving to Massachusetts in 1984. When Mr. Kurnit, who is self-employed, relocated his business from Cambridge to Northampton, more than one hundred miles from the plaintiff's employment in Norwell, she chose to move to Northampton with him rather than to remain in Cambridge and terminate the relationship. The findings of the review examiner do not indicate that he disbelieved the evidence of the plaintiff's emotional and financial commitment to her partner, or that he based his decision on any evidence of a contrary motive. See Cohen v. Board of Registration in Pharmacy, 350 Mass. 246, 252 (1966). Rather, as noted above, his decision resulted from an erroneous interpretation of law. Because the plaintiff has already received her unemployment benefits, see note 1, supra, it is not necessary to have the case redecided. It is sufficient to say that "the review examiner had taken too narrow a view of the factors entering into the determination whether [the plaintiff's] reasons are `urgent, compelling and necessitous.'" Director of the Div. of Employment Sec. v. Fingerman, supra at 464.[5]
Judgment affirmed.
*853 LIACOS, C.J. (concurring).
It is not unusual that issues involving a significant shift in social mores come before this court clothed in the form of a mundane issue. This case, involving a claim for unemployment compensation under G.L.c. 151A, § 25 (e) (1990 ed.), is another example of the process of adjudication where, under the surface, such issues may appear to clash. Justice Greaney, writing for the court, relies on the statutory language and the policies the statute expresses of offering relief to unemployed persons. Justice Nolan, in dissent, relies on the policies, legislative and judicial, of promoting "the singularity of the marital status." Post at 854. It seems to me that both points are well taken. Thus, what might have been a simple matter becomes difficult of decision. While my personal views of the significance of the marital state and the integrity of the traditional family unit tend toward those expressed by Justice Nolan (albeit without embracing the entire tone of the dissent). I must conclude that the analysis of the statutory language and of the judicial gloss placed on it, as described by Justice Greaney, is sound. Thus, I join in the reasoning of the court and in the result reached by it. To do otherwise would risk the imposition of my own personal views on the rights of the parties and the development of the law. See Fort v. Fort, 12 Mass. App. Ct. 411, 414-417 (1981).
NOLAN, J. (dissenting).
I dissent. The court pretends that this case has nothing to do with the question whether Reep was married to the man whom she followed to Northampton to continue their relationship of concubinage. Of course, this pretense is absurd because, if they had been married and Reep left her employment to follow her husband, the case would not be before us (on this issue, at least) and the Civil Liberties Union of Massachusetts, Massachusetts Law Reform Institute, Inc., and Gay & Lesbian Advocates & Defenders, who filed an amicus brief, would have absolutely no interest in the case. The only matter addressed in this amicus brief is the agitation to jettison the traditional concept of *854 family in favor of any amorphous arrangement which parties may find desirable. This argument is the principal thrust of Reep's brief as well. This case is before us precisely because the court must decide whether to treat Reep as if she were married to the man with whom she has cohabited. We are not faced with a brother or sister who terminates his or her employment to follow a sibling who is a dependent or a parent-child relationship of dependency.
Until today, the court has recognized the singularity of the marital status in the face of claims by those who cohabited as if they were married. We have always recognized the distinction. Massachusetts does not recognize common law marriages. We have said that "[c]ohabitation within this Commonwealth, in the absence of a formal solemnization of marriage, does not create the relationship of husband and wife." Davis v. Misiano, 373 Mass. 261, 262 (1977). We have said that a woman has no right to receive separate support without the existence of a marriage. Ragucci v. Ragucci, 357 Mass. 235, 237 (1970).
Massachusetts has a strong public policy in preventing the rules governing marriage from being subverted. Green v. Richmond, 369 Mass. 47, 51 (1975). We have guarded jealously the rules applicable to married people, and we have not extended them to parties who cohabitate without marriage. For example, compelled testimony as to private conversations between spouses after marriage is barred but the disqualification does not apply to conversations before marriage. Commonwealth v. Barronian, 235 Mass. 364, 366 (1920). In Feliciano v. Rosemar Silver Co., 401 Mass. 141, 142 (1987), a man sustained personal injuries and his live-in companion of approximately twenty years sought recovery for loss of consortium. The parties used the man's surname, held themselves out as husband and wife, had joint savings accounts, filed joint tax returns, jointly owned their home, depended on each other for comfort and guidance, and maintained a sexual relationship to the exclusion of all others. We held that she was not entitled to recover for loss of consortium because they were not married. We pointed out that marriage is not a *855 mere contract between parties, but rather, "[i]t is the foundation of a family [and a] social institution of the highest importance," in the integrity of which the Commonwealth has a deep interest. Id. The right to recover for loss of consortium promotes the value of family. As we held in Feliciano, "that value would be subverted by our recognition of a right to recover for loss of consortium by a person who has not accepted the correlative responsibilities of marriage." Id.
The position which I take today with respect to Reep's claim is entirely consistent with the conclusions of courts outside of Massachusetts. See Norman v. Unemployment Ins. Appeals Bd., 34 Cal.3d 1, 3 (1983); Davis v. Department of Employment Sec., 108 Wash.2d 272, 281 (1987). In these cases, unmarried persons left employment to follow their cohabiting partners to other locations and were denied unemployment benefits.
In conclusion, the position taken by the court today is not only bad law; it is mischievous public policy and another paragraph in the obituary for the concept of a traditional family. Pro dolor.
LYNCH, J. (dissenting).
I agree with the views of Justice O'Connor, except that, in the circumstances of this case, I do not see how the experience, technical competence, and knowledge of the agency add any weight to a determination of what is the appropriate statutory standard.
O'CONNOR. J. (dissenting).
General Laws c. 151A, § 25 (1990 cd.), provides: "No ... benefits shall be paid to an individual under this chapter for ... (e) ... the period of unemployment next ensuing ... after he has left his work (1) voluntarily without good cause attributable to the employing unit.... An individual shall not be disqualified from receiving benefits ... if such individual establishes to the satisfaction of the commissioner [of the Department of Employment and Training] that his reasons for leaving were for such an *856 urgent, compelling and necessitous nature as to make his separation involuntary." The statute provides that the burden is on the employee to satisfy the commissioner that he or she had personal reasons for leaving work that were of such a compelling nature as to make the separation involuntary. The employee in this case failed to carry that burden. Yet the court affirms the District Court judgment awarding benefits. The court's holding is wrong in my view. Even if the commissioner's determination was tainted by legal error, as the court has concluded it was, a judicial award of benefits was inappropriate and should not be affirmed. Surely, it cannot be said that, as a matter of law, the plaintiff met her burden of satisfying the commissioner that she left her employment involuntarily. Were this case not now moot, a remand would be required to enable the agency to determine, applying the legal standard adopted today, whether the plaintiff left her job involuntarily.
The more interesting and far-reaching question is whether, as the court has concluded, the agency erred in deciding that the plaintiff was barred from recovery because her reason for leaving work, that is, her desire to follow to another place her "partner" to whom she was not married, as a matter of law was not urgent, compelling, and necessitous. I join Justice Nolan in concluding that the commissioner did not err and that the District Court judge did.
I agree with the Chief Justice that the Justices' "views of the significance of the marital state and the integrity of the traditional family unit" cannot properly dictate the court's decision in this case. The court's task is to determine a question of law, which is whether the commissioner, acting through the review examiner and board of review, properly determined the statutory standard of disqualification and properly applied it to the review examiner's findings. "The statutory exception to disqualification sets a standard calling for an exercise of judgment which is not purely factual. Such a determination, involving the application of the standard [law] to the facts found, brings into play the experience, technical competence, and specialized knowledge of the *857 agency." Director of the Div. of Employment Sec. v. Fingerman, 378 Mass. 461, 463 (1979). The court should have begun its analysis by according some deference to the expertise of the agency, both with respect to determination of the standard and with respect to its application to the facts. This would have been in accord both with our case law and our statutes. General Laws c. 151A, § 42 (1990 ed.), provides that "[t]he findings and decisions of the board shall be reviewed in accordance with the standards for review provided in paragraph (7) of section fourteen of chapter thirty A." Chapter 30A, § 14 (7) (1990 ed.), provides, among other things, that a reviewing court may remand, set aside, or modify an agency decision if it is based on an error of law, and that, in making that determination, "[t]he court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." Nothing in the court's opinion suggests that it has given such weight to the agency's decision.
Quoting prior decisions of the court, the court states that "`[w]hen faced with statutory opaqueness in the unemployment compensation law,' we have construed the statute in favor of the unemployed worker." Ante at 847. In none of the referenced cases was the court considering the question whether the employee's leaving was involuntary. Nothing in our case law remotely suggests that, in determining whether an employee's leaving was voluntary or involuntary, the court's attitude has been that "ties go to the employee."
The court goes on to say, citing four cases as examples, that "[a]pplying the broad provisions of § 25 (e), we have recognized a wide variety of personal circumstances that constitute good cause to decline otherwise suitable employment." Ante at 847-848. The cited cases make clear that a person is not disqualified if he or she leaves work on account of disability, inability to get to work, family (traditional family) obligations, or a desire to follow a spouse to a distant location. None of them suggests the result that the court reaches in this case.
*858 One other statement made by the court requires a response. The court states, ante at 850-851, "This action ... concerns a statutory benefit for which, we have held in another context, a legally cognizable relationship is not a prerequisite. Roush v. Director of the Div. of Employment Sec., [377 Mass. 572, 575 (1979)]." The question in Roush was whether an individual who is eligible to receive unemployment compensation is entitled under c. 151A, § 29 (c), to receive dependency allowances for dependent stepchildren. The court answered the question in the affirmative despite the fact that there is no "legally cognizable relationship" between stepparents and stepchildren. Roush does not support the proposition that a woman who leaves work to follow her partner, with whom she has no legally cognizable relationship, may thereby be qualified to receive unemployment compensation.
The court observes that "we have never held that, where a claimant leaves employment to join a partner in a new locality, unemployment compensation is solely restricted to married spouses." Ante at 849. That, of course, is true. However, it is just as true that the court has never held, nor even hinted by way of dictum, that such a claimant may be entitled to benefits. Indeed, the following language taken from Raytheon Co. v. Director of the Div. of Employment Sec., 344 Mass. 369, 373 (1962), gives the opposite hint: "It would seem onerous to penalize an employer, who has work available, by increasing the charges that he must pay into the fund [see G.L.c. 151A, § 14  the merit rating system] by reason of unemployment resulting from an act of his employee over which the employer has no control. But this argument, however appealing, cannot override what seems to us to be the clearly expressed legislative intent. If as a result of this construction the consequences to employers are unduly harsh, the remedy must come from the Legislature." That case involved three married women who left their employment to live out of State with their husbands. The court concluded that "the better view is that leaving employment to join one's husband may be good cause. depending on all *859 the circumstances of the case," id., despite the fact that such a result would seem "onerous" and "harsh." The clear implication from the 1962 Raytheon Co. court's language is that the court would not conclude that a person, who leaves employment to follow another with whom he or she has no legally cognizable relationship, may be entitled on that ground to unemployment benefits at the expense of employers.
"The Commonwealth has legitimate and strong interests in `the strengthening and encouragement of family life for the protection and care of children.'" P.B.C. v. D.H., 396 Mass. 68, 73 (1985), quoting G.L.c. 119, § 1 (1984 ed.). Indeed, G.L.c. 151A, § 74 (1990 ed.), provides, "this chapter shall be known and may be cited as the Employment and Training Law, and shall be construed liberally in aid of its purpose, which purpose is to lighten the burden which now falls on the unemployed worker and his family." Furthermore, "[m]arriage is not merely a contract between the parties. It is the foundation of the family. It is a social institution of the highest importance. The Commonwealth has a deep interest that its integrity is not jeopardized." Feliciano v. Rosemar Silver Co., 401 Mass. 141, 142 (1987), quoting French v. McAnarney, 290 Mass. 544, 546 (1935). Therefore, the inference that a woman, who leaves her employment to follow her husband to his place of permanent employment at a distant location, was intended by the Legislature to be deemed to have left her employment for "urgent, compelling and necessitous reasons," thus qualifying her for unemployment compensation despite the costs to employers who are "without fault," is a valid inference. It cannot fairly be said, however, that a similar foundation exists to support a conclusion that the Legislature contemplated that employers or taxpayers should be required to finance a "partner" who leaves available employment in order to follow another partner, whether of the same or the other sex. If the Legislature were to have favored that kind of onerous and harsh result, it is fair to assume that it would have said so in G.L.c. 151, § 25 (e), loudly and clearly.
*860 I would reverse the judgment below and would remand this case for the entry of a judgment affirming the action taken by the agency.
NOTES
[1] In the ordinary course, we would vacate the review board's decision and remand the matter for a new hearing. However, following the District Court decision in this case, the parties stipulated that during 1989 and 1990, the plaintiff did receive unemployment benefits totalling $2,558, and that the department would not seek reimbursement of those benefits. It appears, therefore, that the decision appealed from no longer has any operative effect. The stipulation also provided that the department's right to appeal from the District Court decision would not be prejudiced. Because the issue presented by this case is "one of public importance, capable of repetition, yet evading review ... [and] has been fully argued to us in an adversary proceeding," Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 274 (1978), it is appropriate to decide the appeal.
[2] The 1962 Raytheon case was decided before the Legislature enacted St. 1975, c. 684, § 78, amending G.L.c. 151A, § 25 (e), to add the specific language that an individual shall not be disqualified from receiving unemployment benefits if the reasons for leaving work are sufficiently "urgent, compelling and necessitous." The language quoted from the Raytheon case fairly sets forth the current standard. See Director of the Div. of Employment Sec. v. Fingerman, 378 Mass. 461, 464 (1979); Dohoney v. Director of the Div. of Employment Sec., 377 Mass. 333, 335 n. 2 (1979).
[3] In recognition of the changing nature of the "family," the Legislature already has undertaken to provide a suitable definition of that term for purposes of the domestic abuse law, see G.L.c. 209A, § 1 (1990 ed.). The Court of Appeals of New York has set forth standards for making "an objective examination of the relationship of the parties" in order to determine whether an individual is entitled to statutory noneviction protection. See Braschi v. Stahl Assocs. Co., 74 N.Y.2d 201, 212-213 (1989).
[4] Other relevant evidence in this area might include whether the plaintiff and her partner regarded each other and were regarded by others as spouses; whether they shared income; whether they maintained joint checking and savings accounts and joint credit card accounts; whether they had executed powers of attorney in order for one partner to make decisions during the illness of the other; whether they were the named beneficiaries of each other's life insurance policies; or whether they were the legatees or executors of each other's estates.
[5] We acknowledge the amicus brief, submitted by Civil Liberties Union of Massachusetts, Massachusetts Law Reform Institute, Inc., Gay & Lesbian Advocates & Defenders, and Women's Bar Association.